We are now ready for argument in United States v. Garcia-Lagunas. Mr. Sun. May it please the court, I'm Paul Sun. Kelly Dagger and I represent Mr. Garcia-Lagunas. Mr. Garcia-Lagunas was convicted at trial on a cocaine trafficking conspiracy charge after the government relied on race-based evidence to prove his guilt. Consistent with what the district court expressed as its views in a sidebar conference, the government elicited expert testimony from a police officer about the supposed characteristics of Hispanic drug trafficking organizations. And then argued that the jury could and should infer that Mr. Garcia-Lagunas, who was a Mexican national, was guilty because he acted as a Hispanic drug trafficking organization would have him act. The Constitution, the Due Process Clause and the Equal Protection Clauses prohibits the government from using racial generalizations to prove criminal conduct and that's what the government did here. That was an error of constitutional dimension, it was not harmless, and it warrants setting aside the verdict and remaining for a new trial. In a case like this one where the ultimate question is going to be what was the effect on the jury of inadmissible evidence? Did it contribute to the verdict? The court will necessarily look closely at the facts of the case and these are the important facts. The police had information from a number of drug dealers whom they had arrested and were cooperating that there was a Mexican source of supply named Alex, a substantial cocaine supplier. I think we have a good grasp of sort of the historical background here. Perhaps if you don't mind, you could help me crystallize, I think I got it. But originally there were no objections to this line of questioning. There was an objection. I'm sorry? There was an objection. Perhaps you can go right to it. Okay. This happened on redirect. Exactly. And Detective Oriana was testifying and the first question was, do you know something about Hispanic drug trafficking organizations? And there was not an objection to that question. That's what I asked. I said there was no objection originally and you said there was. So now I'm really confused. Okay. To the question that made a difference, there was an objection. He does testify. Well, okay. All questions make a difference because, you know, if you ask question one and there's no objection and then question two and there's no objection and then question three, there's no objection. By the time you get to question four, sometimes, I'm not saying that's this record, sometimes you get down to question four and there's finally an objection and the judge is thinking we're already there. We're already there. Again, I'm not saying that's what happened here. So, again, if you could just. Sure. So you say there was no objection to the question. Does he know something about Hispanic drug trafficking organizations? Okay. Now, you would say today, I'm sure, that was objectionable. I think it was not relevant. What else could be more objectionable than a question calling for irrelevant evidence? Agreed, Your Honor. First week of law school, right? Absolutely. Or at least first week of evidence in law school. Okay. So first question, not relevant, but no objection. Then the next question was, what do Hispanic drug trafficking, in your experience, what have you found that Hispanic drug trafficking organizations do with their proceeds? Bingo. No objection there either. No objection. Also not relevant. Not relevant. Okay. It's then the third question. You weren't there, of course. No, Your Honor. And we weren't there, and I don't think Ms. Fritz was there. So none of us in here today knows what kind of face the judge made, but we can fairly safely assume, can't we, that the judge was sitting there thinking, what in the world is going on here? Honestly, I don't think so, Your Honor, and that's because of this bench conference. Yeah, okay. Can you tell me, though, why is it so clearly irrelevant given what it was in response to? Wasn't the defendant, the appellant's defense that he didn't live an extravagant enough lifestyle to be a drug dealer? Yes, Your Honor. So wouldn't the fact that he didn't live an extravagant lifestyle because he sent money home, wouldn't that arguably be relevant to that point? Two reasons on relevance, Your Honor. First, the law is not going to contemplate as relevant race-based evidence. Well, there's a difference between race-based evidence and evidence linked to this particular defendant. If there had been evidence shown that, in fact, this defendant had made it a practice of sending most of his proceeds to his family, you wouldn't say that that's not relevant, would you? No, not at all, but you're not then using race to establish that conduct. But the second point, Your Honor, and the reason why this couldn't be relevant, there was no evidence about Hispanic drug trafficking organizations. I certainly, you have answered my question. Okay. That's an excellent point. And, Judge Davis, to finish the point on the objections, there was then an objection. There was a bench conference, and the court sustained the objection. It would have been better for the court then to instruct the jury to disregard that testimony as irrelevant. Although there was no such request. There was not. If error, it still might be invited error, but I take your point. And it would be our contention that it was not too late at that point. So the contemporaneous objection rule stands for the first proposition that we don't want to waste judicial resources. We want to give the judge a chance to make a ruling, avoid an error. Don't you just want to argue that it was plain? I mean, because the cat was pretty far out of the bag. Your Honor, I think it is plain error. And the test flips around in terms of the burden. If this is an error of constitutional dimension, then the government has to prove beyond a reasonable doubt that this evidence and argument did not contribute to the verdict. If it's plain error, Mr. Garcia-Levitz has to show that it's error, and unquestionably it was. And it was plain error. There's not a court that we found, there's not a case cited to this court, that has found this kind of racial generalization evidence to be admissible. And that's why you say it's of constitutional dimension. Yes. Because of the subject matter. Yes. It's not the admission of any old inadmissible evidence. It's the admission of racial ethnic evidence, arguably rooted in stereotypes, arguably based on unadmitted, inadmitted, inadmissible expert testimony, and therefore you say it's constitutional error. It is, Your Honor, and so does the government. This is at page 35 of their brief. The use of race or racial stereotypes as a proxy for establishing guilt offends the Constitution. That's not out of our brief, it's not out of the case, it's right from the mouths of the government. And they're right. And that's what happened here. And so error, plain error, the courts, and we could cite, for example, the Cabrera case, which is one of the cases we cited in the Ninth Circuit case, which found plain error in this kind of situation. That admitting racial generalizations to prove criminal conduct does offend the fairness and integrity of the judicial proceedings. And so it comes down to the question of impact on substantial rights. Can we go back to the issue of error? So you would say that the Second Circuit's decision in Cannes was wrongly decided, or is that a different set of facts? It is different, Your Honor. What's at issue there is conduct at a place. In Pakistan, there's a certain way that, well, first of all, the price of drugs. So the question there was, why doesn't the defendant look like a rich, fancy drug dealer? And what the evidence is in Pakistan, not about Pakistanis, but in this place, the market is different because, first of all, the price is relatively low. And second, it's fronted. So you can have a different market context. And then he's dressed like everyone else is in Pakistan. So at that place, there is testimony about a relevant set of facts. It's not based on a racial or national origin generalization. It's a different kind of case. All right. So I guess then, whether it's plain or – I guess it does make a difference, obviously, in terms of the burden. The burden. I mean, wasn't there – I mean, there's a pretty good amount of evidence in this case tying your client to this conspiracy, isn't there? Your Honor – Not the least of which is the cocaine powder spread all over his mouth and face. Your Honor, his defense – there was a coherent defense theory that he was a drug addict, not a drug dealer. He was a cocaine user, not a cocaine seller. And what the government – what the defendant's lawyer tried to highlight were holes in the government's case. And one of the holes was the absence of evidence of wealth. But there was a considerable – fair amount of other evidence by individual purchasers who testified – they did not know each other. Your Honor – Who testified independently about their purchases. Your Honor, the government's case lived or died with the credibility of – or drug dealer witnesses. And you would just probably not be stunned as to how many cases live or die by the credibility of not particularly abnormal people. This is how it works. And here there are, we contend, reasons why it was still error and it had a substantial impact on the jury verdict. This was both because of the character of the evidence and the way the government reacted to it. The character, the prejudicial nature of the evidence. First of all, again, this is plugging a hole in the government's case. They have to have an expert. And Judge Davis, we've made an argument why Detective Orellano's expert testimony was improper. But it's plugging a hole with race-based testimony. That's highly prejudicial testimony. I understand your argument about this one. If I could ask about some other issues that you have. Yes, Your Honor. One of the ones I didn't quite understand was your concern over the use of an interpreter. What did you find objectionable about that? Your Honor, it ties to the testimony immediately before that where the prosecutor says, what is Mr. Garcia-Lagunas' immigration status? And the answer is he's an illegal alien. That's just pure race-baiting. And then they're doubling down on that by saying, look over there. He's got an interpreter. And they elicit testimony from all of the witnesses that they didn't speak Spanish to Mr. Garcia-Lagunas. But it really is a subset of your argument about the question regarding his immigration status. That's what sort of leaps out at you. Yes, it's further race-baiting. He doesn't even really need a Spanish interpreter. First of all, he's a Mexican national. He's a Hispanic drug-trafficking organization. And he's a faker, too. And with respect to the sentencing, could you just briefly address your argument regarding the court's use of an incorrect guidelines range? I can, Your Honor. The original guidelines' offense level was 40. There was an agreement that two of the two-point enhancements, the government withdrew those. And so we were down to a 36. The prosecutor at sentencing said, we would not object to a two-point reduction because of the upcoming change in the guidelines, which everybody knew was coming, as long as the defendant stipulates that he won't then make the motion to get that further benefit. And Mr. Garcia-Lagunas' counsel stipulated. And then the court said, all right, I'm granting that. I'm making that variance, which would have taken us down to a 34. Then, however, the court announced its sentence in judgment and said, I am imposing a sentence at the bottom of the guidelines range. 188 months, which was the sentence imposed, was the bottom of the guideline range at 36, not 34. And then even in the statement of reasons, the court said, the guidelines range is 36, but I am applying a two-level variance, which would have taken it down to 34. And there's just a disconnect there, Your Honor. And it's not harmless because it would appear that the appellant, well, he did. He stipulated away his right to seek the additional. Yes, Your Honor. Thank you. Good morning. Before I get into my argument, I want to make something absolutely clear. I do not condone and my office does not condone the injection of racial matters into a trial. This appeal was vetted at the highest levels of our office, and we asked hard, uncomfortable questions. After serious thought and reflection, I'm standing before this court to say that the defendant's illegal status and the generalization about Hispanic drug traffickers should not have been elicited here. It was potentially inflammatory, and it had little probative value. But you're not going to confess error. I am confessing error as to that. You're not confessing reversible error. That is correct, Your Honor. I am not confessing reversible error. You leave part of it to us. That's fine. And the reason for that is that an examination of the record here shows that this defendant was not convicted based on his ethnicity or race, and it was not the government's intention to exploit his ethnicity or race. The defendant argued that he was too poor to be a drug dealer. He put before the jury an image, a profile of what a big-time drug dealer must look like. He asked, if I'm dealing in all of this cocaine, where is my wealth? I'm sorry, please go ahead, Judge. Why are you explaining what led to what you've acknowledged was error? I mean, is it the point? I'm sorry. I asked you a question, and it cut you off, and I apologize. What were you going to say? We're acknowledging that it was improper for us to elicit that testimony. I want the court to understand, though, why. I understood the context, certainly. There was, the defendant was arguing that the reason I don't look like, he was saying I can't be a drug dealer because I don't live a lifestyle of conspicuous consumption. So this appeared to be in response to that. I think we all understand what led to it. And the point that I want to make is that we wanted to elicit that a modest lifestyle is not incompatible with significant drug dealing. And the problem is, with all respect to your wonderful colleague, I'm sure they're wonderful, they didn't prepare the case. Now, maybe they didn't prepare the case because they did their best to find the evidence, but they couldn't find it. Or maybe they just didn't prepare the case. They didn't think through this guy's supposedly bringing in 40 kilograms of drugs and he's living in some ramshackle trailer sitting around with no shirt on snorting cocaine. And your office, your investigators couldn't find a bike account, couldn't find a Cadillac, couldn't find a BMW, couldn't find anything. So you couldn't find it. So the case wasn't as strong as perhaps you would have liked it to be. But you don't cure that by having some police officer start talking about Hispanic drug dealers out of the blue. You've acknowledged to us how offensive that is. It's absolutely offensive. You don't cure your deficient preparation of a case by resorting to stereotypes. And in response to your question... Thank you. Was there a question? Well, in response to your concern, I think that I would agree that in the heat of trial there are unartful questions, there are poorly worded answers. And there's an absence of evidence in the heat of trial if you haven't prepared your case. I think that what we wanted to elicit here was that it was not incompatible to have a modest lifestyle. And we should have done that without calling upon race or ethnicity. We should have asked the question in such a way that elicited that probative and relevant evidence without injecting something inflammatory. Totally agree. In other words, you should have prepared your case. This officer should have been prepared to offer an answer other than one based on stereotype and his perceived knowledge of the way so-called Hispanic drug dealers operate in North Carolina. And my response to that, Your Honor, is that this was a strong case. The government does not have to show what a drug dealer does with his or her money. In partial response to Judge Davis, you didn't need it. Exactly. And that's your argument. We didn't. Which makes it worse, doesn't it? Resort to racial and ethnic stereotypes when they're not even needed makes it worse. I don't even think you argue harmless error in your brief. Do you argue harmless error in your brief? We argue that this was not reversible error. But you do not argue harmless error in this brief. You agree this is constitutional error if it's error. In fact, you've said it's error. And it's constitutional error, right? Yes. So the burden is on you to prove beyond a reasonable doubt that the error had no substantial effect on the jury's verdict. That's correct. And we believe that based on the evidence that was presented, we can do that here. And I would briefly like to say that I don't believe that the intent here was to object.  So is your position that this error was not preserved by the defendant or was preserved by the defendant? The defendant did not object to the first two questions. The objection was sustained as to the third question, which in that objection, in fact, when- What did you say in your brief? I believe that we said that it was an abuse of discretion standard. But in reviewing for this- So we don't analyze it as plain error. Are you arguing that it was preserved or not? I think that- It really is a yes or no question. Or maybe it's an I don't know question. But it is a- it does have a- It matters. It does have a definitive- There is an answer, I think, a direct answer to his question. I don't know what it is, but we're hoping that you- And if you'll just indulge me, there was an objection and it was based on foundation. It was based on whether this individual had the experience and the expertise to go in this direction. It was not based on the suggestion that there was an attempt here to inflame the jury or to inject something inflammatory. But in looking at this case and in reflecting on this case, this is an incredibly sensitive area. And we are willing to err on the side of caution. And we are willing to acknowledge that this was error. And that's not something that- Although we don't believe that the objection as put to the district court necessarily alerted it to this concern that is being raised on appeal. We are willing to go forward under the more onerous standard. And we believe that we can meet that standard. And we believe that we can do that because this evidence was very strong. There were four co-conspirators from different counties who did not know each other who all testified consistently to the defendant's method of operation. They identified the different locations where the defendant was selling narcotics. They identified the process by which the narcotics were purchased at a particular location. For example, at the Sonoma Street location, you'd pull up in your car, you'd wait. The defendant would come to the car. There would be conversation in the car about the drugs and the price. He would signal to other individuals who were standing back by the lean-to shed. He would go get the drugs and bring them to the purchaser. At least two different individuals who did not know each other testified exactly to that. There were other individuals. I'm sorry, Your Honor. I have a pretty clear sense of the other evidence. I did want to ask and would ask you to address the offense level, the sentencing issue raised about the use of an incorrect guideline rate. When I try to walk through what the district court did here, it seems to me that the district court must have applied a base offense level of 36, not 34. Do you disagree? Okay, so the PSR finds a base offense level of 34 and raised it by 6. Two for possessing the dangerous? I think the total offense level ended up being 36. I'm not certain about whether that was the base offense level. My understanding of what happened here was that certain objections were resolved and there was one objection that remained as to the drug quantity. After that was resolved and the offense level was tallied up, the total offense level ended up being 36. At that point, there were some sentencing arguments made by defense counsel and the government stated that in light of the pending amendments and the Department of Justice's position on that... The court said that it would then not object to an additional two-point reduction. Yes. Which would take it to 34 based on those anticipated amendments in exchange for which the appellant agreed not to seek that reduction when it becomes available. Yes. And so then the district court imposed a 188-month sentence which is within 34, but it said it was going to impose a sentence at the low end. So it looks as though it got confused about actually applying the additional two-point reduction. I think that that may be a fair reading of what happened. It is not entirely clear. So why didn't you concede that error? We did not concede that error, first of all, because the defendant did not object to it. And we don't think then that the confusion was absolutely apparent. There was no motion for reconsideration. And the government continues to believe that yes, to the extent that the court wants to give him the benefit of this reduction, he should get it. But that doesn't mean that we need to have a complete remand and a complete resentencing. The problem, though, but how does it work then? Because he's given up the right to seek the reduction when it becomes available, the additional two points. Well, I can confidently say that we understood his waiver to mean that he would not attempt to seek the benefit of an amendment that he'd already received the benefit of. We think that there is some ambiguity here. And the government's position is that if he were to seek, if he were to file a 3582C motion, we really believe that it is up to the court to say either, you know, I didn't use the right words, it wasn't as clear as it could have been, but I had meant in my thought process, I incorporated that before. Or conversely for the court to say, you know what, you're right, I made a mistake, you didn't get the full benefit of that. I'm going to fix it now. But we don't need a complete resentencing for that. And that's why... But how would we get to that point if the defendant has given up his right to seek the benefit of the reduction? If he waived that right, which it sounded like. Well, I can confidently say that the government would not seek to enforce any waiver because we are concerned that perhaps he didn't get the full benefit. A 3582C motion can also be made on... I believe that it can be made on motion of the court. I think even the government could pursue that and bring that to the court's attention. And what's your concern with our simply sending the case back to the district court based on the record as it stands before us? I don't think that there's necessarily a concern. We just don't think that a complete resentencing with everything that a resentencing entails is necessary. Because he can still receive the benefit of this amendment in some other way. And because we're on a plain air standard. And because he can achieve this relief. We don't believe it has affected his substantial rights. And again, the Department of Justice policy, we want him to have the benefit of this amendment. And to the extent that the court was unclear, we think it is up to the court to clarify that. But you can do that in a 3582C proceeding without a complete resentencing. In addition, one other concern that Your Honor noted was the reference to the interpreter. Again, the defendant's ability to speak English, that was central to this case. And his motion in Lemonade suggested that that might have been a potential defense. Perhaps it was inartful to refer to the interpreter. Certainly the jury was aware that the interpreter was present. And it certainly wasn't an attempt to portray any sort of character quality. It was simply an attempt to make clear that this defendant had the linguistic ability to communicate with the individuals, with the defendants that we were saying were calling him on the phone and buying significant quantities of drugs. Now, unless the court has some further questions, I'd like to end by emphasizing that my office does not condone the injection of racial matters into this trial. We think here that the evidence of the defendant's conduct, his criminal, conspiratorial conduct was overwhelming, making this error harmless. And for that reason, we're asking that you affirm the judgment of the district court. Thank you. Thank you, Mr. Court. The government thought it needed the racial prejudice injected in the case to win the case. The very first witness was Detective Sean Collins, and at the end of his testimony is when the prosecutor elicited the testimony that Mr. Garcia-Lagunas was an illegal alien to maximize the impact. After closing, when the government gives its closing argument, first closing, and then Mr. Garcia-Lagunas' counsel argues, the very first thing on redirect or rebuttal from the government's counsel is, what did Detective Orellano tell you about Hispanic drug trafficking organizations and about what they do with their money? Let's assume that that's true, that the government did think it was critical or added it, even that it was cumulative. Don't we look at the record and decide whether or not there was evidence, untainted evidence sufficient to support the conviction? Yes, Your Honor, but I think the points are related because, again, as the court has acknowledged, the government's entire case depended on the credibility of these four drug dealers. And what the government did was bolster their testimony. It starts off even with Detective Collins, who comes in and he repeats before they even testify all of what they're going to say, so he's pre-sold all the testimony. And then when there's these missing pieces, which are filled both by expert testimony, where's the cocaine, that's where Sean Collins comes in and says, well, the SBI lab just didn't do it right. He had no basis as an expert to testify to that. That was a preserved error. And so the million-dollar cocaine dealer, where's the cocaine? Well, that hole is fixed by Special Agent Collins. Where's the money? That hole is fixed, again, through expert testimony by Detective Oriana. And this court has repeatedly said that expert testimony has the ability to unduly influence a jury. The cases that we've cited from the First, Second, Ninth, D.C., Eighth Circuit, most of those cases, again, involved expert testimony about these racial generalities. And so those courts reversing, including, again, the Cabrera case on a plain-air ground, found that there was that kind of impact. And so what you've got with Detective Oriana, he's a police officer, he's an expert, and he's a native Spanish speaker. So what the government is doing is relying on the authority of his office and the authenticity of this person to maximize the impact of that testimony. And so the government then is left with still trying to bolster the credibility of these drug dealers. Was that testimony a substantial focus of the government's arguments in closing?  Well, that's when it came out. And so I think that tells you the government thinks it was important. But I do want to highlight two of this court's cases, and that's the Johnson and the Garcia case, and the Garcia case was, Judge Davis, your opinion. Those dealt with non-constitutional errors, but still the court found reversible error. And the key there in both cases was the court said, this was testimony that bolstered the inherently not-credible testimony of the drug dealers, which was the rest of the government's case. And that was enough to find reversible error. Those were preserved, but to highlight the impact of that kind of testimony on a jury, this court, so in addition to all the cases that we've cited from other circuits that stand unrebutted as finding error, and at least in two cases, the Doe case was a plain error case too. This court has looked at the vulnerability of a government's case when it relies on drug dealer testimony, inherently incredible. And this jury knew about that. We look at how this jury would have been affected. The court gave several instructions, JA 545 and 546, that told the jury, be careful about drug dealer testimony. May I ask, with respect to the sentencing issue, Ms. Fritz seemed to suggest that this is really much ado about nothing, that there are what I guess are akin to administrative remedies that you have failed to exhaust at the district court. What do you have to say about that? Your Honor, I wasn't engaged at the district court, so I think what I would say is when the lawyer for Mr. Garcia-Lagunas has said, I'm stipulating I'm not going to advance that argument, what else would he do but pursue an appeal? He stipulated that he would not make an argument that Mr. Garcia-Lagunas was entitled to a reduction in his sentence based on the two points. Right, but I think he's suggesting that even now you have a remedy available to you outside of, and that's not to say that we're not going to take action. Obviously, we need to decide this case, but there was a way to resolve this outside of this process. I think that's right, and the government has conceded that they would not challenge that is what I heard today. So you think it can be resolved, that it could be resolved via a 3582 motion at some point down the road? If it was not opposed by the government, I think the issue about letting Judge Fox say, yes, I did intend to sentence at the low end of what was the correct guidelines, which would be 34 and not 36, that could be handled that way. We respectfully request for the reasons argued today and in our brief that the court set aside the verdict and demand for a new trial. Thank you. Thank you very much. The court notes that Mr. Son is court appointed, and we want to thank you for your very able service to your client and to this court. Thank you. We'll come down and greet counsel and take a short recess.
judges: Allyson K. Duncan, Albert Diaz, Andre M. Davis